**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

MICHAEL S. GURNETT,

                Plaintiff,

     v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                Defendant.

Case No. 3:15-cv-00093-SLG

## DECISION AND ORDER

Michael Scott Gurnett filed an application for Disability Insurance Benefits ("disability insurance") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("the Act") respectively,[1] alleging disability beginning October 11, 2007.[2] Mr. Gurnett has exhausted his administrative remedies and seeks relief from this Court.[3] He is self-represented in this appeal. The Court interprets his appeal to argue that the determination by the Commissioner of the Social Security Administration ("Commissioner") that he is not disabled, within the meaning of the Act, is not supported by substantial evidence and the Administrative Law Judge ("ALJ") committed legal

---

[1] The Court uses the term "disability benefits" to include both disability insurance and SSI.

[2] Administrative Record ("A.R.") 240, 242; *see also* Docket 26 at 3.

[3] Docket 1; Docket 6-1; Docket 16 at 1.

errors.[4]  Mr. Gurnett asks for a reversal of the Commissioner's decision and a remand for calculation of benefits.[5]

Defendant filed an answer to the complaint and an answering brief in opposition.[6] Oral argument was not requested and was not necessary to the Court's determination. For the reasons set forth below, Claimant's Motion for Remand at **Docket 1** is **GRANTED IN PART**, the Commissioner's final decision is **VACATED,** and the case is **REMANDED** to the SSA for further proceedings consistent with this decision.

## I.    STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it either is not supported by substantial evidence or is based upon legal error.[7] "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[8]  Such evidence must be "more than a mere scintilla," but may be "less than a preponderance."[9]  In making its determination, the Court considers the evidence in its

---

[4] *See* Docket 1.

[5] Docket 30.

[6] Docket 16 and Docket 26 respectively.

[7] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[8] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[9] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

entirety, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.[10] If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[11]

## II.    DETERMINING DISABILITY

The Act provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[12] In addition, SSI may be available to individuals who are age 65 or over, blind or disabled, but who do not have insured status under the Act.[13] Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[14]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in

---

[10] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[11] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

[12] 42 U.S.C. § 423(a) (2012).

[13] 42 U.S.C. § 1381a (2012).

[14] 42 U.S.C. §§ 423(d)(1)(A) (2012), 1382c(a)(3)(A) (2012).

significant numbers either in the region where such individual lives or in several regions of the country.[15]

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[16] A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[17] If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at step five.[18] The Commissioner can meet this burden in two ways: (a) "by the testimony of a vocational expert," or (b) "by reference to the Medical–Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[19] The steps, and the ALJ's findings in this case, are as follows:

**Step 1.** *Determine whether the claimant is involved in "substantial gainful activity."* **The ALJ concluded Mr. Gurnett had not engaged in substantial gainful activity since October 11, 2007.[20]**

**Step 2.** *Determine whether the claimant has a medically severe impairment or combination of impairments. A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities, and does not consider age, education, or work experience. The severe impairment or combination of impairments must satisfy the*

---

[15] 42 U.S.C. §§ 423(d)(2)(A) (2012), 1382c(a)(3)(B) (2012).

[16] 20 C.F.R. §§ 404.1520(a)(4) (2013), 416.920(a)(4) (2013).

[17] *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074-75 (9th Cir. 2007)); *see also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[18] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098.

[19] *Tackett*, 180 F.3d at 1099.

[20] A.R. 15.

*twelve-month duration requirement.* **The ALJ determined Mr. Gurnett has the following severe impairments: Horner's syndrome, degenerative disk disease of the cervical spine, left shoulder impingement, mild cognitive impairment, and anxiety disorder.**[21] **The ALJ also specifically found the following impairments were not severe: cerebral trauma/head injury, disorder of the autonomic nervous system, and degenerative disk disease of the lumbar spine.**[22]

**Step 3.** *Determine whether the impairment is the equivalent of a number of listed impairments found in 20 C.F.R. pt. 404, subpt. P, App. 1 that are so severe as to preclude substantial gainful activity. If the impairment is the equivalent of one of the listed impairments, and meets the duration requirement, the claimant is conclusively presumed to be disabled. If not, the evaluation goes on to the fourth step.* **The ALJ determined that Mr. Gurnett does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment.**[23]

Before proceeding to step four, a claimant's **residual functional capacity** ("RFC") is assessed.[24] Once determined, the RFC is used at both step four and step five.[25] An RFC assessment is a determination of what a claimant is able to do despite his physical, mental, or other limitations.[26] **The ALJ concluded that Mr. Gurnett has the RFC "to**

---

[21] A.R. 15.

[22] A.R. 16.

[23] A.R. 17.

[24] 20 C.F.R. §§ 404.1520(a)(4)(iv) (2013), 416.920(a)(4)(iv) (2013).

[25] 20 C.F.R. §§ 404.1520(a)(4)(iv-v) (2013), 416.920(a)(4)(iv-v) (2013).

[26] 20 C.F.R. §§ 404.1545(a) (2013), 416.945(a) (2013).

perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he is limited to occasional climbing of ladders, ropes or scaffolds; frequent, not constant, overhead reaching with the bilateral upper extremities; occasional handling with the left, non-dominant, upper extremity; must avoid concentrated exposure to excessive vibration; must avoid moderate exposure to unprotected heights; work is limited to 1- to 4-step tasks involving only few, if any, workplace changes; and work limited to frequent, not constant, interaction with the public."[27]

**Step 4.** *Determine whether the impairment prevents the claimant from performing work performed in the past. At this point, the analysis considers the claimant's RFC and past relevant work. If the claimant can still do his or her past relevant work, the claimant is deemed not to be disabled. Otherwise, the evaluation process moves to the fifth and final step.* **The ALJ found that Mr. Gurnett is capable of performing his past relevant work as a Night Manager/Desk Clerk, DOT No. 238.367-038,[28] deemed light-duty and semi-skilled (SVP 4).[29]**

---

[27] A.R. 19-20.

[28] The Court notes DOT No. 238.367-038 is a hotel clerk, not a manager and it does not include managerial responsibilities in its description. Mr. Gurnett's testimony and disability benefits exhibits specifically described his work as a night manager that extend above and beyond that of the hotel clerk as described in DOT No. 238.367-038. The responsibility and activities listed in DOT No. 238.367-038 describes the general role Mr. Gurnett filled at the hotel where he worked, absent the managerial responsibilities and the overlap into other roles that his specific job required of him, *e.g.,* bouncer, bellhop. *See also* A.R. 78-94. The ALJ's finding that Mr. Gurnett could perform the job described in DOT No. 238.367-038 does not establish that Mr. Gurnett could perform the work he previously did as a Night Manager. The Court invites the ALJ to reconsider this issue on remand.

[29] A.R. 27.

**Step 5.**  *Determine whether the claimant is able to perform other work in the national economy in view of his or her age, education, and work experience, and in light of the RFC.  If so, the claimant is not disabled.  If not, the claimant is considered disabled.*

Although the ALJ could have ended his decision at step four given his conclusion there, he continued to step five.  **Based on the testimony of a vocational expert, the ALJ determined there are other jobs that exist in significant numbers in the national economy that Mr. Gurnett can perform, including basket filler, DOT No. 529.687-010, and hotel/motel cleaner, DOT No. 323.687-014.**[30]

### III.    BACKGROUND

Mr. Gurnett was born in Arizona in 1958 and is currently 58 years old.[31]  He was raised in Alaska[32] and resided in California for an extended time.[33] Mr.  Gurnett returned to Alaska and has continually lived in the state since 2002.[34]  He resides with his long-term partner, who receives disability benefits.[35]  Mr. Gurnett can perform daily living activities on his own without assistance.  He provides some assistance to his partner and they share in household duties[36] with help from automatic cleaning machines for the

---

[30] A.R. 28-29.

[31] A.R. 28, 240, 242, 380.

[32] A.R. 380.

[33] *See* A.R. 253-54, 380.

[34] A.R. 380.

[35] A.R. 43-44.

[36] A.R. 69-70.

shower and toilet as well as a dish washer and trash pickup at their apartment complex.[37]

Mr. Gurnett has a family history of mental health issues; his mother has schizoaffective

disorder requiring frequent in-patient treatment.[38]  He recently received his GED.[39]

Since October 2007, Mr. Gurnett has not engaged in significant employment.[40]  His

employment history consists mostly of restaurant work and hotel service.[41]  He operated

his own restaurant for a time in California.[42]  As an adult living in Alaska, he has worked

at numerous locations, including resorts, hotels, restaurants, and a legal office.[43]

Beginning in 2002, Mr. Gurnett's worked as a night manager at a hotel.  It was

while working there, in December 2002, that Mr. Gurnett witnessed the killing of a

customer.[44]  Mr. Gurnett stayed with the hotel for another three years after witnessing the

homicide, but was ultimately let go in October 2005.[45]  He has suffered from chronic post-

traumatic stress disorder following the homicide[46] as well as severe anxiety, personality

---

[37] A.R. 71-73.

[38] A.R. 379.

[39] A.R. 70 ("I recently passed the GED test . . . I think it was in 2010 or '11").

[40] A.R. 309, 255, 251.

[41] A.R. 309.

[42] A.R. 878.

[43] A.R. 320, 309.

[44] A.R. 377, 495.

[45] A.R.  378.

[46] A.R. 381 (Nov. 2005 psychiatric evaluation by Eileen H. Ha, M.D.); *see also* 378 (discussing diagnosis of acute PTSD by former chiropractor, Dr. Frank Rothgery, in 2003); 591 (history of PTSD assessment in 2007); 1030 (2013 diagnosis of PTSD by psychiatrist Dr. Rachad Rayess).

disorder NOS, and somatization.[47]  He was treated by a psychiatrist[48] and a licensed clinical social worker ("L.C.S.W.")[49] following the homicide to address these issues.[50]

Mr. Gurnett filed a worker's compensation claim concerning his injuries related to the December 2002 homicide that was ultimately denied after two employer-sponsored independent medical examinations ("IME")[51] were conducted in 2003 and concluded no medical or psychiatric issues resulted from the homicide.[52]  Mr. Gurnett appealed the denial of worker's compensation benefits and an additional IME was conducted.[53]  For that IME he also underwent MRIs of his thoracic and lumbar spine, which revealed disc degeneration from L2 to L5 and a small disc herniation to the left of the midline at L5 that displaced the S1 nerve root laterally to a mild degree.[54]  The administrative record in this case is unclear as to the outcome of the worker's compensation benefits appeal.

In 2007, Mr. Gurnett worked as a restaurant server at several restaurants.[55]  In July 2007, Mr. Gurnett's employer at the time called an ambulance to take Mr. Gurnett to

---

[47] A.R. 385, 393.

[48] Eileen H. Ha, M.D.

[49] Stephanie Warnock, L.C.S.W.

[50] A.R. 383-425.

[51] A.R. 369 (psychiatric evaluation, Eileen Ha, M.D., Nov. 30, 2015); *see also* A.R. 378 (psychiatric evaluation, Eileen Ha, M.D., Dec. 2, 2005, reviewing IMEs by Stephen Fuller, M.D., orthopedic surgeon, and David Glass, M.D., psychiatrist).

[52] A.R. 378.

[53] A.R. 366 (Aug. 1, 2007, IME conducted by Dr. Larry Levine).

[54] A.R. 375 (Aug. 23, 2007 MRI impression).

[55] A.R. 309.

the emergency room.[56]  There, he was assessed with anxiety.[57]  In September 2007, at

a different restaurant, during his second week of employment there, he was struck in the

head by a walk-in freezer door that had been kicked open by a co-worker.[58]  After going

to the emergency room two days after the incident, Mr. Gurnett was released from the

hospital after a head CT scan was deemed normal.[59]

Shortly thereafter, at a routine eye exam, an optometrist immediately referred Mr.

Gurnett to an ophthalmologist who queried whether Mr. Gurnett suffered from partial

Horner's syndrome.[60]  Mr. Gurnett was referred to a neurosurgeon who diagnosed him

with Horner's syndrome from an "apparent traumatic dissection of his right distal cervical

internal carotid artery."[61]  The neurosurgeon recommended an angioplasty and stent

---

[56] A.R. 597.

[57] A.R. 598.

[58] A.R. 673.

[59] A.R. 590-591; 673-74.

[60] A.R. 785, 619.  "Horner syndrome is a combination of signs and symptoms caused by the disruption of a nerve pathway from the brain to the face and eye on one side of the body," http://www.mayoclinic.org/diseases-conditions/horner-syndrome/basics/definition/con-20034650 (last visited Sept. 12, 2016).

[61] A.R. 554, 642, 549.

placement because Mr. Gurnett was near complete occlusion of his artery and the carotid stenting would encourage healing.[62]

Prior to the neurosurgeon's referral, Mr. Gurnett filed a new worker's compensation claim regarding the 2007 head trauma.[63]  The insurance company for that claim sought a neurosurgical IME of Mr. Gurnett[64] and the examining doctor agreed that surgery was necessary.[65]  Mr. Gurnett underwent a cerebral angiography on November 15, 2007.[66]  A stent was ultimately not installed by the neurosurgeon because the dissection appeared to be spontaneously healing on its own.[67]  Mr. Gurnett was prescribed Plavix after the surgery and monitored.[68]

While rehabilitating from the artery dissection caused by the blunt trauma to his head, Mr. Gurnett received treatment from a physiatrist,[69] who worked with him on cognitive rehabilitation therapy,[70] received treatment by a certified speech-language

---

[62] A.R. 554, 550.

[63] *See* A.R. 438, 494.

[64] A.R. 552.

[65] A.R. 441-444 (Oct. 29, 2007, IME conducted by Paul Williams, M.D.).

[66] A.R. 426.

[67] A.R. 544, 426, 635, 532.

[68] A.R. 547, 635.

[69] American Academy of Physical Medicine and Rehabilitation website, "Physical Medicine and Rehabilitation (PM&R) physicians, also known as physiatrists, treat a wide variety of medical conditions affecting the brain, spinal cord, nerves, bones, joints, ligaments, muscles, and tendons. "[they] are medical doctors who have completed training in the specialty of [PM&R] http://www.aapmr.org/about-physiatry/about-physical-medicine-rehabilitation/what-is-physiatry (last visited Sept. 14, 2016).

[70] A.R. 673 (Shawn Hadley, M.D., physiatrist).

pathologist,[71] had a neuropsychological evaluation,[72] completed a MMPI-2,[73] and participated in physical therapy.[74] During this time he was receiving worker's compensation benefits.[75]

In 2009, another neurosurgical IME was conducted at the request of the insurance provider for the 2007 head trauma worker's compensation claim.[76] The IME concluded that Mr. Gurnett was medically stable and no restrictions were placed on his ability to return to work.[77] In November 2012, a state mental residual functional capacity assessment observed that Mr. Gurnett was limited with regard to coping with complex task instructions,[78] while a state medical consultant opined that Mr. Gurnett was not

---

[71] Anne Ver Hoef, M.A., C.C.C. - S.L.P.

[72] A.R. 492-502 (Aug. 4-5, 2008, neuropsychological evaluation conducted by Paul L. Craig, Ph.D.).

[73] A.R. 490-91 (Oct. 1, 2008, Minnesota Multiphasic Personality Inventory (MMPI-2) conducted by Paul L. Craig, Ph.D.). Oxford Journals website, MMPI-2 is widely used psychometric test for measuring adult psychopathology in mental health, medical and employment settings, http://occmed.oxfordjournals.org/content/59/2/135.full (last visited Sept. 14, 2016).

[74] A.R 259, 533, 656.

[75] A.R. 676.

[76] A.R. 459-84 (Sept. 25, 2009, IME conducted by Ronald L. Vincent, M.D.).

[77] A.R. 479-80.

[78] A.R. 112, 131.

credible with regard to his medical conditions,[79] and a vocational assessment determined that he could return to his former employment as a restaurant server.[80]

Mr. Gurnett states he avoids crowds to run errands and limits his infrequent driving to off-peak times in order to feel less vulnerable and reduce panic attacks.[81] He adds that he tends to overreact to stimulus, that he reschedules appointments to avoid crowds,[82] that he rarely socializes with family, does not socialize with friends, and does not do social things together with his partner.[83]

Mr. Gurnett claims that his disabilities include Horner's Syndrome; stenosis of the carotid arteries; degenerative disc disease of the cervical spine with moderate to severe narrowing of the C6 and C7, osteophytes, and edema; impairment to the left shoulder including tendinosis and possible impingement lesion, bursitis, and capsulitis; radiculopathy of the cervical spine; anxiety; and depression.[84]

## IV. DISCUSSION

The Court construes Mr. Gurnett's appeal to raise the following six issues: (1) the ALJ committed legal error when discounting Mr. Gurnett's treating source opinions and giving greater weight to non-treating source opinions; (2) the ALJ should not have relied on the opinions of Dr. William or Dr. Vincent—two doctors who conducted EIMEs—

---

[79] A.R. 111,130.

[80] A.R. 115, 134.

[81] A.R. 57, 47.

[82] A.R. 59.

[83] A.R. 60.

[84] A.R. 41-42.

because each of them had been previously disciplined by state medical boards; (3) the ALJ incorrectly discounted the opinion of his former employer, Attorney Steven Constantino, regarding Mr. Gurnett's inability to work as an office assistant; (4) the ALJ incorrectly assessed Mr. Gurnett's credibility by finding that his statements about the intensity, persistence, and limiting effects of his impairments were unsupported by substantial evidence; (5) the ALJ made factual errors in his decision; and (6) the ALJ created a hostile and intimidating atmosphere at the evidentiary hearing and is generally biased against claimants seeking disability benefits.

### (1) Weight of Medical Opinions

"Regardless of its source, [the SSA] will evaluate every medical opinion [it] receive[s]."[85]  Medical opinions come from three types of sources: those who treat the claimant; those who examine but do not treat the claimant; and those who neither examine nor treat the claimant.[86]  "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."[87] And the opinion of an examining, but non-treating, source should generally be given more weight than that of a non-examining source.[88]

Thus, generally, a treating source's opinion should be given the most weight. Indeed, if the treating source's opinion is "well-supported by medically acceptable clinical

---

[85] 20 C.F.R. §§ 404.1527(c) (2013), 416.927(c) (2013).

[86] *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).

[87] *Id.* (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).

[88] *Id.* (citing *Ryan v. Comm'r Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).

and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record, that opinion will be given controlling weight.[89] "If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the Administration considers specified factors in determining the weight it will be given."[90] These factors include the length of the treatment relationship and frequency of examination, as well as the nature and extent of the relationship.[91] When weighing a medical opinion, including that of a treating source that is not controlling, the ALJ must also consider the extent to which the opinion is supported by relevant evidence, such as medical signs and laboratory results; the extent to which an opinion is consistent with other opinions and evidence in the record; whether the opinion is within the source's area of specialization; and other factors such as the familiarity of the SSA disability benefits process and other information in the case record.[92]

Applying these factors means that "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."[93] However, in some cases, the treating source's opinion may not be entitled to the greatest weight. But "an ALJ may reject a treating

---

[89] 20 C.F.R. §§ 404.1527(c)(2) (2013), 416.927(c)(2) (2013).

[90] *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).

[91] 20 C.F.R. §§ 404.1527(c)(2) (2013), 416.927(c)(2) (2013).

[92] *See Orn*, 495 F.3d at 631 (citing 20 C.F.R. §§ 404.1527).

[93] *Id.* at 633 (9th Cir. 2007) (citing SSR 96-2p, 61 Fed. Reg. 34,490, 34,491).

doctor's medical opinion, if no other doctor has contradicted it, only for 'clear and convincing' reasons supported by substantial evidence."[94]

Doctors do not always agree on all matters, and the ALJ is responsible for determining credibility and resolving conflicts and ambiguities in medical testimony.[95] But even when a treating source's opinion is contradicted by the opinion of an examining physician, the treating source's opinion is generally "still entitled to deference."[96] If a treating source's opinion is contradicted by another source, an ALJ still may not reject that treating source's opinion without providing "specific and legitimate reasons supported by substantial evidence in the record."[97] This can be done by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."[98] When an examining source relies on the same clinical findings as a treating source, but differs only in his or her conclusions, the conclusions of the examining source are not considered "substantial evidence" sufficient to support rejecting the treating source's opinion.[99] And when rejecting a treating source's opinions, the ALJ must do more than just offer his own conclusions; instead, "[h]e must set forth his

---

[94] *Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) (citing *Reddick v. Chater,* 157 F.3d 715, 725 (9th Cir.1998)).

[95] *Lewis*, 236 F.3d at 509 (citing *Reddick,* 157 F.3d at 722).

[96] *Orn*, 495 F.3d at 633 (citing SSR 96-2p, 61 Fed. Reg. at 34,491).

[97] *Orn*, 495 F.3d at 633 (quoting *Reddick*, 157 F.3d at 725).

[98] *Reddick*, 157 F.3d at 725 (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

[99] *Orn*, 495 F.3d at 632.

own interpretations and explain why they, rather than the doctors', are correct."[100]  But an ALJ may discredit a treating source's opinions that are "conclusory, brief, and unsupported by the record as a whole or by objective medical findings."[101]

The SSA also permits a claimant to provide evidence from non-physician sources to show the severity of an impairment and how it affects a claimant's ability to work, including evidence from a nurse practitioner, physicians' assistant, or therapist.[102]  A certified speech-language pathologist can provide evidence of the severity of an impairment, and may also provide evidence of the existence of a speech or language impairment.[103]

In this case, the ALJ detailed certain medical opinion evidence in the administrative record and included the weight he gave to various medical sources.  The ALJ did not give "great weight" to nearly all of Mr. Gurnett's medical providers, and in many instances gave their opinions no weight at all.  On this topic, the Court interprets Mr. Gurnett's complaint to mean that he disputes: (1) the ALJ's reliance on the state agency medical and psychological non-examining consultants instead of his doctors, who currently treat him and some of whom he had previously requested the SSA use if consultative examinations were deemed necessary;[104] (2) the ALJ's reliance on employer-sponsored IMEs ("EIME")

---

[100] *Reddick*, 157 F.3d at 725 (citing *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988)).

[101] *Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014) (quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004)) (emphasis omitted).

[102] 20 C.F.R. §§ 404.1513(d) (2013), 416.913(d) (2013).

[103] 20 C.F.R. §§ 404.1513(a)(5) (2013), 416.913((a)(5) (2013).

[104] Docket 1 at 2; A.R. 321.

related to previous worker's compensation claims that were performed by doctors who had been severely disciplined;[105] (3) the reliance on the vocational expert's opinion over a treating physician's; (4) the ALJ's rejection of Dr. Rothoff's opinion that Mr. Gurnett is unable to work full-time in any capacity; (5) the ALJ's complete dismissal of Dr. Fraser's opinions; (6) the ALJ's decision to give no weight to Anne Ver Hoef's opinion; (7) the decision to give no weight to Dr. Carl Rosen's opinion; and (8) the ALJ's decision to give considerable weight to one opinion of Dr. Hadley, while ignoring all the other opinions of that doctor.[106]

The Commissioner responds that the ALJ provided legally sufficient reasons for discounting each of Mr. Gurnett's treating source's opinions and favoring the opinions that the ALJ found were consistent with the record evidence as a whole.[107]

For clarity, the Court lists the medical providers whose records are included in the administrative record:

After the 2002 homicide trauma, Mr. Gurnett was treated by the following medical providers: (1) Dr. Ha, psychiatrist, and (2) Stephanie Warnock, L.C.S.W., beginning in 2005.  And he was examined, but not treated, by the following doctors for this incident: (1) Dr. Levine; (2) Dr. Glass, psychiatrist; and (3) Dr. Fuller, orthopedic surgeon, each of whom conducted an EIME.

---

[105] Docket 1 at 3-4; *see* Docket 30 at 1.

[106] *See* Docket 1 at 3-5.

[107] Docket 26 at 18.

Following the 2007 head trauma, Mr. Gurnett was treated by two main groups of doctors, some of whom overlap. The groups are based on time frame. Immediately following the head trauma Mr. Gurnett was treated by: (1) Dr. Brinkerhoff, optometrist; (2) Dr. Rosen, ophthalmologist; (3) Dr. Tolbert, neurosurgeon; (4) Dr. Hadley, physiatrist; (5) Dr. Spaulding, primary care provider; (6) Anne Ver Hoef, certified speech-language pathologist; (7) Mary Margaret Hillstand, adult nurse practitioner ("A.N.P.") specializing in neurology; (8) Dr. Baldauf, cardiologist; and (9) Dr. Ryan, orthopedic surgeon. There are also a few treatment notes from Ms. Warnock, L.C.S.W., that were last dated November 1, 2007.[108]

Since 2011, Mr. Gurnett has been treated by the following practitioners, most of whom worked at one location under an integrated health model: (1) Dr. Shirley Fraser, neurologist; (2) Dr. Rachad Rayess, psychiatrist; (3) Dr. Michelle Rothoff, primary care provider; (4) Dr. Donovan, clinical psychologist; and (5) Kathy Chastain, A.N.P. Mr. Gurnett also continued to be treated by Dr. Brinkerhoff and Dr. Rosen.

Lastly, Mr. Gurnett was examined, but not treated, by the following doctors for the 2007 head trauma: (1) Dr. Craig, clinical neuropsychologist; (2) Dr. Williams, neurosurgeon; (3) Dr. Vincent, neurosurgeon; and (4) Dr. Barrington, chiropractor. The first three doctors conducted EIMEs.

As the discussion above indicates, an ALJ should generally accord the greatest weight to opinions of a treating source, less weight to the opinions of an examining source,

---

[108] A.R. 392.

and the least weight to opinions of a non-examining source.[109]  Here, the ALJ did almost

the opposite, assigning "great weight" and "considerable weight" to two non-examining

sources, assigning "great weight" to one of two examining sources, and assigning "no

weight" or "little weight" to five treating sources, and wholly failing to consider one other

treating source.  There are of course circumstances in which the ALJ may depart from

the generally applicable relative weights.  But to do so the ALJ must provide either "clear

or convincing reasons supported by substantial evidence," if the treating source's opinion

is not contradicted by another source, or "specific and legitimate reasons supported by

substantial evidence" if the treating source's opinion is contradicted.  The ALJ failed to

satisfy these requirements.

(A) *Mr. Gurnett's Treating Source's Opinions*

> *Cleary Donovan, Psy.D., Michelle Rothoff, M.D., Rachad Rayess, M.D., and Kathy Chastain, A.N.P.*

The administrative records shows Dr. Rothoff treated Mr. Gurnett beginning in

November 2011,[110] as a primary care provider, and was also involved in his treatment in

2013.[111]  Dr. Rayess treated Mr. Gurnett in the beginning half of 2013 as a psychiatrist.[112]

Dr. Donovan treated Mr. Gurnett as a counselor using psychotherapy, including cognitive

---

[109] *See* 20 C.F.R. § 404.1527(c)(1-2).

[110] A.R. 818.

[111] A.R. 1005-07.

[112] A.R. 945-47, 961-63, 1029-30.

behavior therapy.[113]   The administrative record shows she started to treat him after he was referred to her by Dr. Rayess, in June 2013, around the time Dr. Rayess stopped treating Mr. Gurnett.[114]   The last medical record associated with Dr. Donovan is dated October 29, 2013.[115]   The administrative record also contains treatment records from Ms. Chastain, A.N.P., beginning in June 2011, for behavioral health.[116]

Dr. Donovan's professional opinions of Mr. Gurnett are throughout her treatment records; but the ALJ mentions her only once in his decision.   He refers to her when citing to statements reported by Mr. Gurnett to Dr. Donovan regarding his activities of daily life.[117]   And the ALJ does not acknowledge a rather important opinion made by Dr. Donovan: on September 25, 2013 she opined on the parameters Mr. Gurnett could tolerate in a workplace setting at that time.[118]   To her, Mr. Gurnett is substantially limited in his ability to work.   She opines he needs low noise and distraction, no quick calculation or adjustments, adequate orientation and training, as well as an understanding and

---

[113] A.R. 1031, 1032, 976.

[114] *See* A.R. 1030, 1032, 1026.

[115] A.R. 1034.

[116] A.R. 822.

[117] A.R. 25.

[118] A.R. 999.

supportive supervisor, and to have limited work hours, approximately a few hours twice per week.[119]

Dr. Rothoff's opinions mostly relate to 2011,[120] and she also completed a "Health Status Report Form" as well as "Certification of Medical Status" form for chronic and acute medical assistance in September 2013.[121] Dr. Donavan gave these forms to Dr. Rothoff to complete.[122] The ALJ gave the opinion in these forms "no weight" because he determined there was "no rationale" for it and he deemed it "without support and [thus] conclusory."[123] The ALJ did not discuss any other opinions expressed by Dr. Rothoff contained in the medical records dating back to 2011.

Dr. Rayess diagnosed Mr. Gurnett with PSTD and psychotic disorder NOS.[124] He opined that, due to Mr. Gurnett's anxiety and difficulty focusing, any mentally demanding work would result in significant PTSD symptoms and Mr. Gurnett could therefore not work in any stressful environment.[125] He opined that Mr. Gurnett was markedly affected by these impairments in his ability to carry out complex instructions and make judgments on

---

[119] A.R. 999.

[120] *E.g.*, A.R. 814-21.

[121] A.R. 996-98.

[122] A.R. 999.

[123] A.R. 26.

[124] A.R. 946-47, 1030.

[125] A.R. 961-62 (Medical Source Statement of Ability to Do Work-Related Activities (Mental), dated May 8, 2013).

complex work-related decisions.[126]   He also opined that Mr. Gurnett was moderately impaired in his ability to make judgments on simple work-related decisions, or understand and remember complex instructions, and that he was mildly impaired in his ability to understand, remember, and carry out simple instructions.[127]   The ALJ gave "considerable weight" to Dr. Rayess's opinion that Mr. Gurnett "experiences 'marked' limitations in his ability to carry out complex instructions and make judgments on complex work-related decisions," but the ALJ did not address Dr. Rayess's other opinions.[128]

The ALJ's decision did not mention Ms. Chastain's opinions that Mr. Gurnett is bipolar[129] and suffers from anxiety disorder NOS[130] as well as depression with anxiety.[131] Her records are replete with objective observations and her subjective impressions of Mr. Gurnett.   She observed, for example, that Mr. Gurnett's "thought process is grossly tangential and circumstantial" and that his "impulse control" is sometimes "variable."[132]

The Court finds the ALJ erred in not addressing at all either Dr. Donovan's opinions regarding her treatment of Mr. Gurnett or any of Ms. Chastain's opinions, and by ignoring most of the opinions expressed by Dr. Rayess.   The ALJ is required to "evaluate every medical opinion it receives"; but the ALJ did not discuss and apparently did not consider

---

[126] A.R. 961.

[127] A.R. 961.

[128] A.R. 26.

[129] A.R. 825.

[130] A.R. 823.

[131] A.R. 800.

[132] A.R. 822-23.

any of the opinions rendered by Dr. Donavan. And yet Dr. Donovan is a treating source—her opinions should be given "controlling weight" if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record."[133]  Even if the ALJ found that they did not meet that standard, he should have deferred to those opinions unless there were "clear and convincing reasons supported by substantial evidence" to disregard them.[134] And if Dr. Donovan's opinions were contradicted by another doctor—and the ALJ did not indicate that this was so—then he still must consider them unless he provides "specific and legitimate reasons supported by substantial evidence in the record."[135]  The ALJ committed legal error by failing to discuss these opinions at all.

One of Dr. Donovan's opinions appears to have been presented through Dr. Rothoff, who completed a form at Dr. Donovan's request.[136]  The ALJ attributed this opinion to Dr. Rothoff and dismissed it as conclusory. The form did not leave room for a detailed explanation of the basis for the opinion, but the opinion, whether it originated with Dr. Rothoff or Dr. Donovan, does not appear to be either conclusory or unsupported. The ALJ has a duty to "conduct an appropriate inquiry" if the ALJ determines it is necessary to know the basis of the treating source's opinion.[137]  Despite the quirk in the paperwork,

---

[133] 20 C.F.R. § 404.1527(c)(2).

[134] *Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2007) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)).

[135] *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007) (quoting *Reddick*, 157 F.3d at 725).

[136] *See* A.R. 1008, 1005-07.

[137] *See Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996).

the administrative record indicates that Dr. Rothoff coordinated her treatment of Mr. Gurnett with that of other providers at the Anchorage Neighborhood Health Center ("ANHC")—Dr. Fraser, Dr. Donovan, and Ms. Chastain, A.N.P. The opinion thus had the treatment records from ANHC behind it. And while the ALJ may have misapprehended Dr. Rothoff's role in Mr. Gurnett's treatment, and the Commissioner was unable to discern Dr. Rothoff's field of practice,[138] the Court finds that Dr. Rothoff was Mr. Gurnett's primary care provider.[139] Because Dr. Rothoff is a treating source, the ALJ could not wholly dismiss her opinions unless he offered specific reasons or if the doctor's opinions were "conclusory, brief, and unsupported by the record as a whole."[140] The ALJ's finding that Dr. Rothoff's opinion had "no rationale" is contrary to the record, which is replete with detailed accounts of the treatment Mr. Gurnett received at ANHC. The ALJ therefore committed legal error by giving this medical opinion "no weight," and also committed legal error by disregarding entirely Dr. Rothoff's other medical opinions from 2011.

Regarding Dr. Rayess's opinions, the ALJ considered only one and ignored all the others. In the same document containing the opinion to which the ALJ gave "considerable weight,"[141] Dr. Rayess also states, in what appears to be his own handwriting, that Mr. Gurnett has "PTSD and a personality disorder" as well as "anxiety and difficulty focusing," and that he "cannot be in any stressful work environment" because "any work that is

---

[138] A.R. 26; Docket 26 at 17.

[139] A.R. 988; *see* 816, 818, 828, 831.

[140] 20 C.F.R. § 404.1513(d).

[141] A.R. 26.

demanding mentally will result in significant PTSD symptoms."[142]  Moreover, in other records Dr. Rayess states that Mr. Gurnett experiences "auditory hallucinations" and that "his thought process is very circumstantial."[143]  The ALJ does not acknowledge or address these opinions at all.  The ALJ committed legal error because he must consider all medical opinions, and must give "clear and convincing reasons supported by substantial evidence" for disregarding the opinions of treating sources.[144]

Ms. Chastain is a nurse practitioner, and thus is not qualified to "provide evidence to establish an impairment."[145]  But she is qualified to provide evidence "to show the severity of [an] impairment."[146]  The ALJ thus erred in not considering her opinions to the extent that they show the severity of any of Mr. Gurnett's opinions.

An ALJ's legal errors are subject to the harmless error test.[147]  The ALJ's failure to consider Dr. Donovan's treatment or opinions and his failure to consider the bulk of Dr. Rayess's opinions were not harmless.  The Court need not decide whether the ALJ's failure to explicitly state what weight he gave the opinions of either Dr. Rothoff or Ms. Chastain, A.N.P., was harmless.  Neither opined as to work-related impairments or restrictions and both diagnosed Mr. Gurnett with anxiety, which the ALJ found to be a

---

[142] A.R. 961-62.

[143] A.R. 1029-30.

[144] *Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2007) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)).

[145] 20 C.F.R. § 404.1513(a).

[146] 20 C.F.R. § 404.1513(d).

[147] *See Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012).

severe impairment. Nonetheless, on remand, the ALJ is directed to address: all of Dr. Donovan's opinions, including her opinion about the appropriate parameters of his work environment; all opinions of Dr. Rayess; Ms. Chastain's opinions as they relate to the severity of Mr. Gurnett's impairments; and the opinions of Dr. Rothoff in light of the two years' worth of treatment records from ANHC.

*Shirley Fraser, M.D.*

Dr. Fraser, a neurologist, treated Mr. Gurnett after he was referred to her by Dr. Rothoff.[148] The administrative record shows that Dr. Fraser began treating Mr. Gurnett in March 2012.[149] In Dr. Fraser's opinion, Mr. Gurnett would be unable to work due to the distracting nature of articulated neurological events affecting his left side.[150] She described those events as "seizure-like, or equal to seizure." In a physician examination, Dr. Fraser noted "wasting/atrophy of the left side of his lower chest and abdomen" and "mild atrophy of the left face, or his cheek," which is where Mr. Gurnett complained of tremors. She considered these findings to be "consistent with the diffuse injury" Mr. Gurnett received that "affect[ed] his autonomic system on the left side of his body" as well as "the spinal motor neurons." She also stated that "she strongly feel[s]" that when Mr. Gurnett suffered the left carotid dissection it "involved the left vagus nerve and some superficial nerves, as well." And she opined that his symptoms are "tantamount to a seizure-like disorder" and "seriously impair his ability to work, especially when combined

---

[148] A.R. 816.

[149] A.R. 809.

[150] A.R. 26; *see also* A.R. 949.

with his easily distract-able and mildly paranoid personality."[151]  She further opined that

the left carotid dissection that caused Horner's Syndrome probably also included "a small

cord infarct[152] . . . which is responsible for the left-sided atrophy, weakness, and muscle

spasms that he suffers [and] . . . also probably accounts for the stiffness and poor

movement of his left foot."[153]

The ALJ references one opinion by Dr. Fraser that she made on January 23, 2013;

he rejected it because it was "based upon [Mr. Gurnett's] unreliable subjective reports" of

such "neurological events" and thus he gave her opinion "no weight."[154]

The Court finds the ALJ erred in failing to address all the opinions of Mr. Gurnett's

treating neurologist.  The ALJ's implication that Dr. Fraser, a licensed neurologist, is

unable to accurately assess her patient's conditions without being deceived by

malingering is not well-taken.  More importantly, contrary to the ALJ's assertion that the

opinion was based on Mr. Gurnett's subjective reports, Dr. Fraser made personal

observations about Mr. Gurnett that include objective evidence of his wasting, atrophy,

stiffness, weakness, and poor movement.[155]  She treated him for more than a year[156] and

---

[151] A.R. 949.

[152] National Institute of Neurological Disorders and Stroke website, definition of spinal cord infarction "a stroke either within the spinal cord or the arteries that supply it," http://www.ninds.nih.gov/disorders/spinal_infarction/spinal_infarction.htm (last visited Sept. 13, 2016).

[153] A.R. 1025.

[154] A.R. 26.

[155] A.R. 987, 811.

[156] *See* A.R. 809, 954, 986, 948-49, 1024-25.

she states that over time, she became "impressed with the amount of dysfunction [Mr. Gurnett] has" and that she felt "very strongly that he is psychiatrically significantly impaired."[157]  Indeed, she referred Mr. Gurnett to a psychiatrist, Dr. Rayess.[158]  She also observed that because Mr. Gurnett is very intelligent, it is "difficult to spot [his functional impairment] on a casual examination."[159]

The ALJ may reject the opinion of a treating source only for "clear and convincing reasons supported by substantial evidence."  The reason the ALJ gave for rejecting Dr. Fraser's opinion is neither convincing nor supported by substantial evidence.  This error was not harmless.  On remand, the ALJ is directed to specifically address each of Dr. Fraser's opinions and determine what weight to give each.  Because Dr. Fraser was a treating source, her opinion is entitled to deference.  If the ALJ seeks to reject Dr. Fraser's opinions, he must set out a "detailed and thorough summary of the facts and conflicting clinical evidence, stat[e] his interpretation thereof, and mak[e] findings."[160]

> *Marshall Tolbert, M.D.*

Dr. Tolbert is a neurosurgeon who performed a cerebral angiography on Mr. Gurnett in November 2007 because of the left internal carotid artery dissection caused by the 2007 head trauma.  Dr. Tolbert initially planned to treat the dissection aggressively

---

[157] A.R. 986.

[158] A.R. 945-47.

[159] A.R. 986.

[160] *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)).

with angioplasty and stent placement due to the "near complete occlusion of his artery,"[161] but did not perform either procedure because the dissection flap was healing.[162] It was instead monitored and managed with antiplatelet medication.[163]

Dr. Tolbert continued to treat Mr. Gurnett following the surgery. In February 2008, Dr. Tolbert restricted Mr. Gurnett from "chiropractic manipulation" and "activities with high impact to cervical region, such as snowmachining, ATV riding."[164] In April 2008, Dr. Tolbert stated Mr. Gurnett had limitations related to "any risk of cervical carotid artery injury" including "any acute rapid change in head position such as with chiropractic manipulations or being struck in the head forcefully."[165]

In August 2008, Dr. Tolbert determined that the left internal carotid artery dissection had completely healed, that he would continue to proscribe Plavix to Mr. Gurnett for one year, and that there were no physical restrictions from his standpoint beyond "avoid[ing] activities [placing him] at high risk for significant trauma to the head or neck, such as downhill skiing" and "avoid[ing] chiropractic manipulation."[166] Mr. Gurnett was advised to be very careful when carrying heavy objects to prevent them from falling on his head and to take care when descending staircases where he could fall and strike

---

[161] A.R. 554.

[162] A.R. 547.

[163] A.R. 533.

[164] A.R. 577.

[165] A.R. 545.

[166] A.R. 542.

his head.[167]  Dr. Tolbert evaluated Mr. Gurnett again on July 22, 2009, and on January 20, 2010, where he confirmed his specific advisement against chiropractic manipulation and general advisement against being placed in situations where one is "likely to be struck forcefully in the head."[168]

The ALJ found that Dr. Tolbert's opinion related to the restrictions he placed on Mr. Gurnett from engaging activities with "high impact" to the cervical region such as snow-machining or ATV riding was not supported by a rationale and thus gave it "little weight."[169]

The Court finds the ALJ erred in giving Dr. Tolbert's opinion little weight. Even if the opinion of Dr. Tolbert—a treating source—does not meet the standard for controlling weight, his opinion is still entitled to deference. The extent of that deference is to be determined relative to several factors—among them, the length, frequency, nature, and extent of the treatment relationship. Dr. Tolbert treated Mr. Gurnett over the course of several years, and the ALJ must give consideration to that relationship. As a specialist in neurosurgery, and one who performed a cerebral angiograph on Mr. Gurnett with the

---

[167] A.R. 545.

[168] A.R. 533, 536.

[169] A.R. 26; *see* 577.

intent to proceed with an angioplasty and stent placement, the restriction placed on Mr. Gurnett following the surgery does not need extensive explanations.[170]

This error was likely harmless, however, because the ALJ did not consider such high-impact type jobs as viable for Mr. Gurnett's work options. Indeed, the ALJ limited Mr. Gurnett's RFC from concentrated exposure to excessive vibration.[171] Moreover, Dr. Tolbert did not repeat the limitations on snow-machining and ATV riding in his more recent evaluation of Mr. Gurnett in January 2010. Nonetheless, on remand, the ALJ is directed to consider Dr. Tolbert's restrictions on Mr. Gurnett in light of Dr. Tolbert's specialty and the specific treatment relationship between the two.

### Carl E. Rosen, M.D.

Dr. Rosen, an ophthalmologist, treated Mr. Gurnett immediately after the 2007 head trauma, when he was referred by Mr. Gurnett's optometrist. Dr. Rosen continued to treat Mr. Gurnett annually until at least 2013.[172] In March 2009, Dr. Rosen opined that Mr. Gurnett would suffer from permanent impairment to his left eye, by way of miosis, ptosis, and convergence weakness, and that "an office setting with good lighting" would be an appropriate setting where Mr. Gurnett could resume work.[173] The ALJ gave Dr.

---

[170] *See Orn v. Astrue*, 495 F.3d 625, 634 (9th Cir. 2007) (finding error when the ALJ dismissed treating sources' "opinions that were substantiated by the contemporaneous medical tests and Orn's medical condition.")

[171] A.R. 19.

[172] *See* A.R. 55, 964.

[173] A.R. 458.

Rosen's opinion no weight.[174]  Again, the reason stated by the ALJ for the rejection of the opinion was that Dr. Rosen gave "no rationale" for the opinion and thus he found it conclusory.[175]

The Court finds the ALJ erred in rejecting Dr. Rosen's opinion regarding the light conditions in which Mr. Gurnett could work.  Dr. Rosen was one of Mr. Gurnett's treating sources.  The ALJ must account for the nature, extent, length, and frequency of the treatment relationship.  The basis for the opinion appears to be the information gleaned during the treatment relationship; if the ALJ is unsure of the basis for then he must "conduct an appropriate inquiry."[176]  Dr. Rosen is a treating source, a specialist, and has an extensive physician-patient relationship with Mr. Gurnett.  His opinion should not have been wholly discarded by the ALJ as merely conclusory.

This error may well be harmless, however, because the vocational expert who testified as to what jobs a hypothetical person, with Mr. Gurnett's impairments, could perform did not include office-type settings.  On remand, however, the ALJ is directed to

---

[174] A.R. 25.

[175] A.R. 25.

[176] *See Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996).

incorporate the lighting conditions expressed by Dr. Rosen into Mr. Gurnett's RFC, absent other substantial evidence to the contrary.

*Shawn Hadley, M.D.*

Dr. Hadley, a physiatrist, began treating Mr. Gurnett in June 2008, after he was referred to her by Dr. Tolbert.[177]  Dr. Hadley first conducted a physiatric consultation and then worked with Mr. Gurnett during his rehabilitation from the 2007 head trauma using cognitive rehabilitation therapy.[178]  In April 2009, Dr. Hadley specifically found that Mr. Gurnett could not work as a formal waiter, busser, small business owner, kitchen and hotel manager, porter, or as a restaurant or coffee shop manager.[179]  And she also predicted at that time that Mr. Gurnett will realize a permanent partial impairment from the 2007 head trauma, although she declined to perform the rating herself; but Dr. Hadley predicted that Mr. Gurnett would be capable of performing light work when he reached medical stability.[180]

The ALJ gave Dr. Hadley's prediction "considerable weight" because it was consistent with her recorded examination findings in her initial physiatric consultation

---

[177] A.R. 673.

[178] A.R. 680.

[179] A.R. 719-723.  The Court notes that Dr. Hadley's opinion in this regard directly contradicts the ALJ's determination that Mr. Gurnett can perform his past duties as a night manager at a hotel with a restaurant.  *See supra* note 28.

[180] A.R. 724.

conducted in June 2008. The ALJ noted that Dr. Hadley had treated Mr. Gurnett for over a year when she made the prediction.[181]

The Court finds the ALJ erred by considering only Dr. Hadley's prediction of Mr. Gurnett's future physical capacities related to work. First, the ALJ cannot select only one piece of information and ignore the rest of the related information or the context surrounding it.[182] Second, Dr. Hadley treated Mr. Gurnett until at least August 11, 2010.[183] The only mention of Dr. Hadley's opinions is the one reference to her 2009 "prediction"—notably not a current assessment.[184] The ALJ must consider all medical opinions, whatever their source. He failed to do so by apparently ignoring Dr. Hadley's opinion that Mr. Gurnett could not work as a formal waiter, busser, small business owner, kitchen and hotel manager, porter, or as a restaurant or coffee shop manager.

### Anne Ver Hoef, S.L.P.

Anne Ver Hoef, S.L.P., worked with Mr. Gurnett from September 2008 until September 2010.[185] She provided cognitive-language rehabilitation that was coordinated with Dr. Hadley, Dr. Spaulding, and Dr. Tolbert.[186] In August 2009, Ms. Ver Hoef opined

---

[181] A.R. 26.

[182] *Cf. Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) (citing *Holohan v. Massanri*, 246 F.3d 1195, 1205 (9th Cir. 2001)).

[183] *See* A.R. 681.

[184] A.R. 677.

[185] A.R. 877, 897, 918.

[186] A.R. 881; *see also* A.R. 919-29.

that Mr. Gurnett would "not do well in the fast paced, multi-taking world of restaurant work"[187] and in June 2009 opined that he would not do well as a manager in a store, restaurant, hotel, coffee shop, or kitchen, or as a waiter, busser, or porter.[188]

The ALJ rejected Ms. Ver Hoef's opinion regarding Mr. Gurnett's ability to return to work as a waiter as conclusory and gave it no weight.[189] The ALJ also points out in his decision that determinations that someone is "disabled" or "unable to work" as defined by the Act are dispositive administrative findings, not medical opinions.[190] The Commissioner argues that Ms. Ver Hoef was not an acceptable medical source qualified under the regulations to render a medical opinion and reiterates that the agency has responsibility for determining whether someone is disabled or unable to work.[191]

The ALJ erred in rejecting wholesale Ms. Ver Hoef's opinion and the Commissioner is mistaken that Ms. Ver Hoef is not qualified to render a medical opinion. Although the ALJ correctly states that it is the Commissioner's responsibility to determine whether someone is disabled—the ALJ cannot simply dismiss two years' worth of treatment records and the opinions contained therein without explanation. Moreover, although statements made by medical providers that fall within the realm of dispositive administrative findings are not treated as medical opinions afforded special deference,

---

[187] A.R. 888.

[188] A.R. 932-937.

[189] A.R. 26.

[190] A.R. 26.

[191] Docket 26 at 10.

neither are they to be rejected entirely.[192]  First, Ms. Ver Hoef specifically discusses her experiences while working with Mr. Gurnett in simulated "waiter settings" that were included as part of his rehabilitation.[193]  This discussion alone shows her opinion was not conclusory.  Second, a speech-language pathologist, such as Ms. Ver Hoef, is specifically permitted to provide a medical opinion to establish speech or language impairments.[194]

On remand, the ALJ is directed to evaluate all of Ms. Ver Hoef's opinions using the appropriate and required factors.

And although Mr. Gurnett has not claimed he suffers from a speech or language impairment, many treating doctors have observed how challenging it is to have a linear, concise, and direct dialogue with him.[195]  Consequently, the evidence from Mr. Gurnett's speech-language pathologist should be considered, in addition to other objective medical

---

[192] *See* 20 C.F.R. §§ 404.1527(d)(3), 404.1513(d).

[193] A.R. 876.

[194] 20 C.F.R. § 404.1513(a)(5).

[195] *E.g.*, A.R. 946 ("his other limitation is his circumstantial thinking," Dr. Rayess, March 13, 2013); A.R. 809 ("rambling, digressive, and at times difficult to follow," Dr. Fraser, Dr. Fraser, March 7, 2012); A.R. 812-13 ("thought process circumstantial" assessment "depression with anxiety," Kathy Chastain, A.N.P., March 3, 2012); A.R. 759 ("trouble retaining information and during visit has difficulty maintaining focus," Dr. Spaulding, Nov. 30, 2009); A.R. 896 ("Mr. Gurnett has a tendency to run-on or get side-tracked [with] topics," Ms. Ver Hoef, S.L.P., Oct. 29, 2008.

records, to determine whether he has a speech or language impairment, and if so, how severe it is as well as how it impacts his ability to work.

(B) *Examining and Non-Examining Sources' Opinions*

"Generally," the ALJ will "give more weight to opinions from [a claimant's] treating sources," even if the treating source opinion is not given controlling weight.[196] And, generally, the ALJ will "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]."[197] Mr. Gurnett claims that the ALJ erred in the relative weight he assigned to the opinions of several non-treating sources.

*Larry Levine, M.D., Paul Williams, M.D., Ronald Vincent, M.D.*

Dr. Levine conducted an EIME of Mr. Gurnett in August 2007. At that time, Dr. Levine was unable to make any diagnosis and had little by way of opinions, beyond the need for conducting MRIs of Mr. Gurnett's spine.[198] MRIs were completed shortly thereafter.[199] Dr. Levine then diagnosed Mr. Gurnett with a normal thoracic spine, but noted on the lumbar spine some multilevel degenerative changes with some disc abnormality at most levels, and a small protrusion left of midline considered a small

---

[196] 20 C.F.R. § 404.1527(c)(2); *see also Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007) (citing SSR 96-2p, 61 Fed. Reg. 34,490, 34,491).

[197] 20 C.F.R. § 404.1527(c)(1).

[198] A.R. 371-72.

[199] A.R. 374-75.

herniation contacting the S1 nerve root.[200]  He opined that Mr. Gurnett had a three percent whole person impairment from these spinal issues.[201]  The ALJ does not discuss Dr. Levine's opinion at all in his decision; however, he does discuss the underlying MRI and concluded that Mr. Gurnett's degenerative disease of the lumbar spine was not a severe impairment.[202]  The ALJ did find that Mr. Gurnett had a severe impairment of degenerative disc disease of the cervical spine.[203]

Dr. Williams conducted two EIMEs of Mr. Gurnett, one in 2007 and one in 2008. The 2007 EIME was conducted to determine whether cerebral angioplasty was necessary.  Dr. Williams concurred with the medical interpretation of Mr. Gurnett's injury and the recommended course of treatment.[204]  At that time, he also found Mr. Gurnett was not medically stable.  In April 2008, post-angiograph, Dr. Williams conducted the second EIME.  In it, he opined that Mr. Gurnett had reached medical stability and that he did not have a permanent impairment, but that he should not lift greater than 50 pounds on an occasional basis.[205]

The ALJ gave Dr. Williams's opinion that Mr. Gurnett has a permanent restriction against lifting greater than 50 pounds on an occasional basis only "limited weight."[206]  He

---

[200] A.R. 365; *see also* A.R. 375 (MRI Report).

[201] A.R. 365.

[202] A.R. 16.

[203] A.R. 15.

[204] A.R. 441-43.

[205] A.R. 436-37.

[206] A.R. 25.

stated he did so because the EIME conclusions were made based on information only up until April 2008 and subsequent records revealed worsening of Mr. Gurnett's left shoulder impairment since then.[207]

Dr. Vincent conducted an EIME in September 2009, again at the behest of the insurance company for Mr. Gurnett's former employer.[208] Dr. Vincent confirmed that the 2007 head trauma injury Mr. Gurnett sustained was the substantial cause on a "more-than-probable-than-not-basis" of Mr. Gurnett's left carotid dissection and Horner's syndrome.[209] Dr. Vincent also opined that Mr. Gurnett had reached medical stability[210] and that Mr. Gurnett "absolutely has a [zero] percent impairment" from his left carotid artery dissection as it would relate to his brain.[211] The ALJ gave Dr. Vincent's opinion that the left carotid artery dissection had a zero percent impairment great weight because he found it reliable after considering the evidence.[212]

Dr. Dennis, the state psychological consultant, conducted a review of Mr. Gurnett's medical records and opined that Mr. Gurnett had difficulty concentrating. Dr. Dennis also noted evidence in the medical records indicating Mr. Gurnett did not have difficulties with his activities of daily living.[213] Dr. Dennis, so far as the Court can glean from the record,

---

[207] A.R. 25.

[208] A.R. 463.

[209] A.R. 476.

[210] A.R. 479.

[211] A.R. 462.

[212] A.R. 25.

[213] A.R.112, 124.

did not conduct any examination of Mr. Gurnett. The ALJ gave "great weight" to Dr. Dennis's opinion that Mr. Gurnett "had no significant limitations in activities of daily living or social functions, but is limited from complex task instructions."[214]

Dr. O'Brien, the state medical consultant, also conducted a review of Mr. Gurnett's medical records. He opined that Mr. Gurnett was not credible and could return to work as a server.[215] He also opined that Mr. Gurnett had limitations when reaching overhead with either arm, could only occasionally climb ladders/ropes/scaffolds; could only occasionally lift or carry fifty pounds, but could frequently lift or carry twenty-five pounds; could stand, walk or sit for about six hours in an eight-hour workday, and should avoid constant overhead reaching; but otherwise Dr. O'Brien identified no restrictions on Mr. Gurnett's physical abilities.[216] So far as the Court can discern, Dr. O'Brien, like Dr. Dennis, did not conduct an actual examination of Mr. Gurnett.

The ALJ gave considerable weight to Dr. O'Brien's opinion that Mr. Gurnett could "stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hour[s] in an 8-hour workday; occasionally climb ladders, ropes or scaffolds; and must avoid 'constant' overhead reaching bilaterally."[217] But the ALJ found that Dr. O'Brien had

---

[214] A.R. 25.

[215] A.R. 111,115, 130, 134.

[216] A.R. 127-29.

[217] A.R. 25.

not adequately considered Mr. Gurnett's subjective reports and therefore found that Mr. Gurnett was instead limited to lifting and carrying at the light exertional level.[218]

Having concluded above that the ALJ made non-harmless legal errors in his evaluation of some of Mr. Gurnett's treating source's opinion, the Court need not reach the issue of whether the ALJ erred in evaluating the examining and non-examining sources' opinions at this time. Upon remand, the ALJ is directed to reconsider these opinions, according to each the requisite weight as indicated by the regulations and Ninth Circuit precedent.

### (2) Examining Physician Opinions by Disciplined Doctors

Mr. Gurnett next argues that the ALJ erred in relying on EIME's conducted by two different doctors who have both been disciplined by state medical boards. He has provided disciplinary records for both Dr. Paul C. Williams and Dr. Ronald L. Vincent, each of whom trained in neurosurgery. The Commissioner argues that neither doctor's disciplinary action has bearing on this case.[219] She claims that there is no evidence Dr. Williams was not licensed in Oregon when he conducted the 2007 and 2008 EIMEs and rendered his opinion in that state.[220] And she claims that Dr. Vincent was not "formally" disciplined, but rather entered into a stipulation to informal disposition of a violation.[221] In response to Mr. Gurnett's suggestion that the ALJ could not rely on examinations done

---

[218] A.R. 25.

[219] Docket 26 at 13-14.

[220] Docket 26 at 9.

[221] Docket 26 at 13-14.

at the behest of an insurer,[222] the Commissioner contends that the initial impetus for the EIMEs is irrelevant.[223]

The ALJ did not err in considering the opinions of either doctor. The EIMEs were conducted in states where the doctors were licensed by that state's medical board, Dr. Williams in Oregon and Dr. Vincent in Washington. The doctors' prior disciplinary records do not completely undermine their medical opinions, even if those records may be considered in determining the appropriate weight to give the opinions. The doctors provided EIMEs in their field of expertise, *i.e.,* neurosurgery. Neither opined outside their field of expertise. In fact, Dr. Vincent specifically recommended other specialized EIMEs when prompted to answer questions outside the field of neurosurgery. Consequently, neither doctor was prohibited from conducting the EIMEs, and the underlying purpose for the EIMEs does not preclude their consideration in these proceedings.[224] Lastly, the ALJ did not wholesale adopt their recommendations and instead evaluated them in light of all

---

[222] Docket 1 at 2.

[223] Docket 26 at 14.

[224] *Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1996) ("The purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them. An examining doctor's findings are entitled to no less weight when the examination is procured by the claimant than when it is obtained by the Commissioner." (citing *Ratto v. Secretary*, 839 F. Supp. 1415, 1426 (D. Or. 1993))).

the evaluations in the administrative record before him. The Court does not find error in this regard.

### (3) Lay Opinion of Mr. Constantino

"'[C]ompetent lay witness testimony cannot be disregarded without comment' and 'in order to discount competent lay witness testimony, the ALJ must give reasons that are germane to each witness.'"[225]

In a thoughtful letter, Mr. Gurnett's former boss, Steven Constantino, Esq., articulates his impression of Mr. Gurnett's performance as an office assistant. Mr. Constantino was Mr. Gurnett's employer for approximately six months while Mr. Gurnett was studying to become a paralegal through the worker's compensation rehabilitation program. Mr. Constantino hired Mr. Gurnett to work in his law office as an office receptionist/administrative assistant. When hiring him, Mr. Constantino was aware of Mr. Gurnett's head trauma, prolonged absence from the workforce, and lack of previous experience in clerical work.[226]

Mr. Constantino states in his letter, "from the outset it was evident that Mr. Gurnett had difficulty concentrating and focusing on his task at hand" and that Mr. Gurnett was unable to retain or apply instructions. They tried breaking down simple tasks into a series of "small carefully defined steps" that Mr. Gurnett strived to complete to perfection, but the perfection became a "near obsession" causing delays in his efficiency. Mr.

---

[225] *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1007 (9th Cir. 2015) (quoting *Molina v. Astrue,* 674 F.3d 1104, 1114 (9th Cir. 2012)) (alteration in original).

[226] *See* A.R. 277-78.

Constantino stated that Mr. Gurnett became anxious and somewhat confused with slight day-to-day deviations from a learned routine. He struggled with multi-tasking and prioritizing between competing obligations. And despite six months at the job, Mr. Gurnett "never achieved the level of independence, efficiency, or performance" Mr. Constantino "expects from an entry level clerical staff after a few weeks." Mr. Constantino opined that Mr. Gurnett should not attempt to compete in the labor market for clerical jobs in the private sector.[227]

The ALJ gave "limited weight" to this letter because there was "no indication Mr. Constantino is a health care professional" and his opinions "must be based on observing the claimant and thus, based heavily on the claimant's presentation and effort in the work place." The ALJ emphasized what he found to be a lack of objective and clinical evidence in the administrative record supporting the gravity of limitations described by Mr. Constantino.[228]

The Commissioner mirrors the ALJ's sentiments, contending Mr. Constantino's observations were merely based on Mr. Gurnett's presentation and effort. And since the ALJ found Mr. Gurnett to lack credibility, the Commissioner maintains that the ALJ could necessarily discount Mr. Constantino's opinion.[229] Moreover, the Commissioner argues, the ALJ could properly reject the lay opinion when it was inconsistent with the clinical

---

[227] A.R. 277-78.

[228] A.R. 27.

[229] Docket 26 at 18-19.

evidence.[230]  Mr. Gurnett counters that Mr. Constantino is qualified to opine on his ability to perform at his job as an injured worker because he has been a practicing attorney for thirty years, has helped to write Alaska disability law, and has served as a neutral hearing officer for the Alaska worker's compensation board.[231]

The Court finds the ALJ erred in according only "limited weight" to Mr. Constantino's opinion, as he did not give reasons that were germane to this witness when rejecting what appears to be competent evidence.  Mr. Constantino's letter describes how he worked very closely with Mr. Gurnett, trying different approaches in an effort to skill-build in the area of receptionist/administrative assistant for half a year to no avail.[232]  Mr. Constantino did not "simply parrot" Mr. Gurnett's subjective complaints.[233]  Rather, Mr. Constantino—who, like Mr. Gurnett's treating sources and unlike either the state examiners or the ALJ, worked closely with him over a lengthy period—specifically expressed his belief in Mr. Gurnett's "genuine desire to succeed" by stating he "never questioned Mr. Gurnett's motivation or desire to succeed at his job" and that "it was obvious to the entire staff that [Mr. Gurnett] was serious about his job [and] trying his best."[234]  But more importantly, Mr. Constantino's opinion was based not on Mr. Gurnett's representations to Mr. Constantino, but on Mr. Constantino's personal observation of Mr.

---

[230] Docket 26 at 19 (citing *Bayliss v. Barnhart*, 277 F.3d 1211, 1218 (9th Cir. 2005).

[231] Docket 1 at 5.

[232] A.R. 277-78.

[233] *Cf. Hanes v. Colvin*, No. 14-16055, 2016 WL 3212172, at *1 (9th Cir. June 10, 2016).

[234] A.R. 278.

Gurnett's performance on the job. Thus, even if Mr. Gurnett's credibility was properly discounted, it would not justify disregarding Mr. Constantino's objective observations.

As the ALJ erred in his assessment of the clinical data by improperly discounting the opinions of Mr. Gurnett's treating sources, the purported inconsistency with objective data is not a valid basis for disregarding Mr. Constantino's opinion—an opinion which, the Court notes, appears to be quite consistent with many medical opinions concerning Mr. Gurnett.[235]

On remand, the ALJ is instructed to consider Mr. Constantino's letter or give reasons germane to him as to why it should be disregarded.

### (4) Credibility Assessment of Mr. Gurnett

The ALJ is charged with determining credibility, resolving conflicts in testimony, and resolving ambiguities in the record.[236] In order to find a claimant's pain or symptom testimony not credible, the ALJ must make two findings.[237] First, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."[238] Second, "if the claimant has produced that evidence, and the ALJ has not

---

[235] *Compare, e.g.*, A.R. 277 ("[I]t was evident that Mr. Gurnett had difficulty concentrating . . . was easily distracted . . . seemed unable to retain instructions . . . showed a tendency to become anxious . . . [and] had great difficulty multitasking . . . ."), *with, e.g.*, A.R. 759 ("trouble retaining information and during visit has difficulty maintaining focus," Dr. Spaulding, Nov. 30, 2009).

[236] *Treichler v. Comm'r Soc. Sec. Admin*, 775 F.3d 1090, 1099 (9th Cir. 2014).

[237] *Id.* at 1102.

[238] *Id.* (quoting *Lingenfelter v. Astrue,* 504 F.3d 1028, 1036 (9th Cir. 2007)).

determined that the claimant is malingering, the ALJ must provide 'specific, clear and convincing reasons for' rejecting the claimant's testimony regarding the severity of the claimant's symptoms."[239]

The Ninth Circuit explained that in giving "specific, clear and convincing" reasons, the ALJ is required to "specifically identify the testimony [from a claimant] she or he finds not to be credible and . . . explain what evidence undermines [that] testimony"; "[g]eneral findings are insufficient."[240] An ALJ "does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination."[241] In short, the ALJ must specify which testimony he finds not credible, and then provide clear and convincing reasons, supported by evidence in the record, to explain that credibility determination.

Here, the ALJ found that Mr. Gurnett's medically determinable impairments could reasonably be expected to cause the alleged symptoms; but that his "statements concerning the intensity, persistence and limiting effects of these symptoms" were not entirely credible.[242] Specifically, the ALJ found that Mr. Gurnett's statements regarding: (1) the severity of Horner's syndrome were not wholly credible;[243] (2) the severity of his

---

[239] *Id.* (quoting *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir.1996)); *see also Burrell v. Colvin*, 775 F.3d 1133, 1136-37 (9th Cir. 2014) (specifically rejecting government's argument that clear and convincing requirements does not apply).

[240] *Id.* (quoting *Holohan v. Massanari,* 246 F.3d 1195, 1208 (9th Cir. 2001), and *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1995)) (alterations and omission in original).

[241] *Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015).

[242] A.R. 21.

[243] A.R. 21.

cervical spine impairment were not wholly credible due to a lack of objective evidence and the lack of consistent and significant clinical findings;[244] (3) the left shoulder impairment were inconsistent with objective medical evidence, his treatment-seeking behavior, and the nature of the treatment he received for his shoulder;[245] (4) cognitive impairment were not consistent with objective medical evidence or his examination results and thus not wholly credible;[246] (5) anxiety and PTSD symptom severity were not supported by objective evidence, his treatment-seeking behavior, or clinical findings and thus not wholly credible;[247] and (6) debilitating side effects of his medications were not wholly credible.[248]   The ALJ also pointed to other reasons to question Mr. Gurnett's credibility, including his tendency "to exaggerate symptoms," his ability to perform activities of daily living not only for himself, but also for his mentally impaired partner.  The ALJ also identified certain comments made by doctors regarding Mr. Gurnett's poor effort in physical exertion tests and simultaneous capacity to be a poor historian and yet recall specific details on other matters.[249]

Mr. Gurnett responds that being over-reactive is not the same thing as exaggerating.[250]   And he points to medical evidence in the administrative record to

---

[244] A.R. 22.

[245] A.R. 22-23.

[246] A.R. 23.

[247] A.R. 23-24.

[248] A.R. 24.

[249] A.R. 24-25.

[250] Docket 1 at 4.

support his claims and refers to other providers that are not in the record, *e.g.,* "Dr. Cherry."[251] The Commissioner asserts that Mr. Gurnett is merely unhappy with the ALJ's interpretation of the evidence, and even though Mr. Gurnett has an alternate interpretation, it is the ALJ's responsibility to weigh the evidence,[252] and that the ALJ provided legally sufficient reasons for finding Mr. Gurnett's statements not entirely credible.[253]

The Court declines to address this issue at this time. Because the case is being remanded to the ALJ for further proceedings to address the opinions of Mr. Gurnett's treating sources, the ALJ may find that Mr. Gurnett's statements regarding the intensity, persistence and limiting effects of his symptoms are credible. The Court notes that the ALJ has not found that Mr. Gurnett is malingering. Indeed, most treating sources express their belief in the genuineness in Mr. Gurnett's efforts to improve and follow through with advice or instruction.[254] The ALJ is obligated to provide "'specific, clear and convincing reasons for' rejecting his statements regarding the severity of his symptoms"[255] on

---

[251] *See* Docket 1 at 3.

[252] Docket 26 at 14.

[253] Docket 26 at 11, 16.

[254] *E.g.*, A.R. 497 ("[Mr. Gurnett's] good performance … speaks positively about his level of effort on tasks sensitive to memory and his general approach to testing", malingering screening by Dr. Craig, August 2008).

[255] *Treichler v. Comm'r, Soc. Sec. Admin*, 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)).

remand should he continue to find that Mr. Gurnett's statements related to the intensity, persistence, and limiting effects of his symptoms are not credible.

### (5) Factual Errors and Mischaracterizations in the ALJ's decision

*Factual Errors*

Mr. Gurnett claims that the following assertions in the ALJ's decision were factually inaccurate: (1) that Mr. Gurnett had not undergone surgery on his neck for the internal carotid dissection; (2) that Mr. Gurnett had fusion performed on his vertebrae;[256] (3) that the neuropsychology evaluation conducted of Mr. Gurnett was in 2009; and (4) that Mr. Gurnett did not receive treatment at Providence and ANHC prior to 2013.[257] The Commissioner admitted to the first three errors and argues that they are harmless and thus this Court cannot take action on them.[258] The Commissioner did not respond to the fourth claim of factual error.

"An error is harmless only if it is 'inconsequential to the ultimate non-disability determination.'"[259] The first three errors Mr. Gurnett points out to do not impact his disability determination and thus are inconsequential and harmless. Regarding the neuropsychological evaluation, the year it was conducted is relevant to establish that it occurred after the alleged onset date of disability, *i.e.,* October 2007. But as between

---

[256] The Court interprets Mr. Gurnett's statement "there is no past fusion. No fusion has been done" to relate to his vertebrae and not his eyes, where fusion is an issue. *See* Docket 1 at 3; A.R. 47; *see also* Docket 26 at 12.

[257] Docket 1 at 3, 4.

[258] Docket 26 at 10, 12, 17.

[259] *Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015) (quoting *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012)).

2008 and 2009 it does not matter. If the ALJ had chosen to ignore the evaluation or had pre-dated it to substantially before the alleged onset date, then there may be cause to address the error. As it is, any factual misstatement as between 2008 and 2009 is harmless.

As to the ALJ's error that Mr. Gurnett had undergone a fusion procedure, it actually likely favored Mr. Gurnett. Having one's vertebrae fused is a permanent procedure that likely has a negative consequence to one's range of motion. It would be an additional impairment that the ALJ would have been required to consider. And because it appears the ALJ believed the fusion had occurred, the impairment was likely considered in Mr. Gurnett's RFC determination.

The error that Mr. Gurnett's had not undergone surgery for his internal carotid dissection is more troubling; but it does not rise to the level of reversible error. The ALJ must have assessed Mr. Garnett's physical condition after the surgery as it is pervasive in the medical records. His physical condition was affected by the surgery and thus the surgery's impact is necessarily incorporated into the medical records. Had the ALJ failed to review, assess, and evaluate Mr. Gurnett's physical condition post-surgery to formulate his RFC because he did not understand Mr. Gurnett had undergone surgery, then the error might have risen to the level of affecting the ultimate non-disability determination. But that is not the case here.

Regarding the error that Mr. Gurnett did not receive treatment at Providence and ANHC prior to 2013 for anxiety or anxiety-related impairments, the Court finds the ALJ did err and that the error is not harmless. Mr. Gurnett had been seeing Kathy Chastain,

A.N.P., at ANHC from as early as June 2011,[260] and he saw Dr. Fraser beginning in March 2012.[261]  Moreover, he was seen by Ms. Warnock, L.C.S.W. regularly from April 2006[262] to November 2007.[263]  On remand, the ALJ is directed to take into consideration Mr. Gurnett's seven-year-plus span of on-going anxiety issues when making a credibility determination about his statements related to the intensity, persistence, and limiting effects of the impairment as well as its impact on his other impairments.

*Mischaracterizations*

The following mischaracterizations are alleged by Mr. Gurnett: (1) that overreacting is not the same as exaggerating; (2) that insurance-induced referrals for medical opinions and referrals by treating doctors are not the equivalent of treatment-seeking behavior; (3) that Mr. Gurnett did not voluntarily terminate his physical therapy;[264] and (4) that he did not move apartments by himself, but instead hired movers.[265]

The Commissioner specifically responded to the third and fourth mischaracterization complaints.  She claims the record does not support Mr. Gurnett's assertion that movers helped him move apartments and cites to a provider who "noted that he was 'Moving apartments' in the context of him having 'no new complaints of

_____

[260] A.R. 825.

[261] A.R. 809.

[262] A.R. 425.

[263] A.R. 392.

[264] Docket 1 at 4.

[265] Docket 1 at 4; *see* A.R. 887.

pain.'"[266] The Commissioner also asserts that even if Mr. Gurnett stopped his physical therapy because of a lack of insurance coverage, the ALJ "cited to other evidence that undermined [his] allegations of disabling left shoulder pain."[267]

The Court invites the ALJ to consider these contentions on remand.  Mr. Gurnett is correct that "overreacting" emotionally is not the same as exaggerating and is not necessarily an indicator of lack of credibility.  Certainly visiting doctors at the request or insistence of an insurer or employer is not treatment-seeking behavior.  If Mr. Gurnett did indeed cease physical therapy because of a lack of insurance, the ALJ should consider that fact.  And the Commissioner is mistaken that there is no evidence to support Mr. Gurnett's assertion with regard to hiring movers.  Ms. Ver Hoef states in a progress summary that "[Mr. Gurnett] was able to make arrangements for others to help him move to a new apartment and did what he could to help."[268]

### (6) <u>Hostile Environment Created by ALJ at Evidentiary Hearing & Biased Opinion</u>

Mr. Gurnett alleges the ALJ made his disability benefits appeals hearing hostile and intimidating.  He also asserts that ALJ has "created a toxic and inequitable field for disability plaintiffs in the Anchorage area" in a deliberate and conspiratorial manner to undermine their rights to disability benefits.[269]  He attached to his briefing two letters from

---

[266] Docket 26 at 15.

[267] Docket 26 at 14.

[268] A.R. 887.

[269] Docket 30.

then–United States Senator, Mark Begich, to the Commissioner dated May 20, 2013,[270] and April 30, 2014;[271] a joint resolution from the Alaska Legislature introduced in February 2014;[272] and a report from the Disability Law Center of Alaska dated March 2014 regarding Alaska ALJ disability benefit decision statistics compared to national averages.[273]

Mr. Gurnett was represented by counsel at the administrative hearing. The Court is not persuaded that Mr. Gurnett was harmed by the ALJ's direction at that hearing that Mr. Gurnett not talk and instead allow his attorney to address the ALJ as his representative. Even if the ALJ's tone was harsh, that would not violate Mr. Gurnett's due process rights. And any hostility that Mr. Gurnett may have felt should have been tempered by his attorney's presence, which Mr. Gurnett does not allege to be inadequate or otherwise deficient.

As to the allegation of a generally toxic and inequitable field for all disability-benefit–seeking plaintiffs in Alaska, the Court takes no position. This Court and this proceeding is not the proper venue to raise general concerns regarding the SSA or any specific concerns about the ALJ's overall performance in handling disability benefit

---

[270] Docket 30-1 at 1.

[271] Docket 30-1 at 4-5.

[272] Docket 30-1 at 2-3.

[273] Docket 30-1 at 6-20.

claims.  Absent direct injury suffered by Mr. Gurnett because of the ALJ's actions, there is no relief available from this Court concerning that particular allegation.

## V.    CONCLUSION

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are not supported by substantial evidence and are not free from legal error.   Accordingly, IT IS ORDERED THAT **Docket 1** is **GRANTED IN PART**, the Commissioner's final decision is **VACATED,** and the case is **REMANDED** to the SSA for further proceedings consistent with this decision.

The Court also **GRANTS** the Commissioner's Motion for Reconsideration at **Docket 32**.  The Court did not consider the additional evidence on the CD.  However, on remand Mr. Gurnett shall be permitted to present the evidence on the CD to the ALJ for appropriate consideration.

The Clerk of Court is directed to enter judgment accordingly.

DATED this 30th day of September, 2016, in Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE